IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 2:22-CR-86 |
| CHARLES HUNTER HOBSON | |

## UNITED STATES' TRIAL MEMORANDUM

The United States of America, by and through undersigned counsel, hereby submits its Memorandum in advance of the trial of Defendant, Charles Hunter Hobson, scheduled to begin on Monday, February 9, 2026. This Memorandum will address: (1) the charges alleged in the Indictment (ECF No. 3); (2) trial length and the Government's anticipated evidence (including fact and expert witnesses); (3) anticipated evidentiary issues at trial, including the circumstances under which Defendant may open the door to introduction of his proffer-protected statements; (4) Defendant's anticipated witnesses and exhibits; (5) outstanding motions; and (6) additional steps the government intends to take to streamline the presentation of certain types of voluminous documentary evidence in this case.

## I.   CHARGES AGAINST DEFENDANT HOBSON

The charges in this case target a years-long scheme in which Defendant Hobson, Vice President of Sales and Marketing at Corsa Coal Corporation ("Corsa" or the "Company"), worked with two co-conspirators to pay bribes to Egyptian officials at Egypt's state-owned and state-controlled coke and chemicals company, Al Nasr Company for Coke & Chemicals ("Al Nasr"), in exchange for the award of contracts for Corsa. Defendant's two co-conspirators included (i) his colleague at Corsa, fellow Vice President Frederick N. Cushmore, Jr., and (ii) Ahmed Nassar,[1]

---

[1] The name of the Egyptian entity, "Al Nasr," is similar to that of the sales agent, Ahmed Nassar. To avoid confusion, the Government will refer to Corsa's sales agent as "Ahmed Nassar" or "Ahmed."

who negotiated on Corsa's behalf in Egypt, as Corsa's third-party sales agent. Defendant's scheme, along with the efforts of his co-conspirators, yielded nearly $140 million in contracts to Corsa. Defendant also defrauded Corsa, taking roughly $200,000 in kickbacks from the commission payments that Defendant authorized Corsa to pay Ahmed.

**A. Overview of Charges**

In March 2022, a grand jury returned the indictment in this case, ECF No. 3, charging Defendant with the following seven counts:

Count 1: Conspiracy to Violate the Foreign Corrupt Practices Act ("FCPA")
This count addresses Defendant Hobson's 2016-2020 conspiracy with Mr. Cushmore and Ahmed to pay bribes to Egyptian officials at Al Nasr, to secure contracts for Corsa.

*Statute*: 18 U.S.C. § 371 (conspiracy to violate 15 U.S.C. § 78dd-2)


Count 2: Substantive Violation of the FCPA
This count charges Defendant Hobson with violating the FCPA for causing employees of Corsa to wire Ahmed a "commission" payment of more than $380,000 on April 20, 2017, that, in fact, was in furtherance of Defendant's scheme to bribe foreign officials.

*Statute*: 15 U.S.C. § 78dd-2; 18 U.S.C. § 2

*Use of the means and instrumentalities of interstate and international commerce*:
On or about April 20, 2017, Defendant caused employees of Corsa, located in the Western District of Pennsylvania, to initiate a wire transfer in the amount of $385,166 from Corsa's bank account in Ohio to Ahmed's bank account in the United Arab Emirates.

Count 3: Substantive Violation of the FCPA
This count charges Defendant Hobson with violating the FCPA for causing employees of Corsa to wire Ahmed a "commission" payment of $240,000 on August 10, 2017, that, in fact, was in furtherance of Defendant's scheme to bribe foreign officials.

*Statute*: 15 U.S.C. § 78dd-2; 18 U.S.C. § 2

*Use of the means and instrumentalities of interstate and international commerce*:
On or about August 10, 2017, Defendant sent an email to employees of Corsa in the Western District of Pennsylvania, directing payment of invoices totaling $240,000, to Ahmed.

<u>Count 4: International Money Laundering Conspiracy</u>
This count addresses the agreement that existed among Defendant Hobson, Mr. Cushmore, and Ahmed to transport/transmit/transfer funds internationally, with the intent to promote either (i) the violation of the FCPA, or (ii) Egyptian law prohibiting bribery of public officials.

*Statute*: 18 U.S.C. § 1956(h)

*Specified Unlawful Activity*:
1) Violation of the FCPA – 15 U.S.C § 78dd-2
2) Offense against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Egyptian law 18 U.S.C. § 1956(c)(7)(B)(iv)

<u>Count 5: Substantive International Money Laundering</u>
This substantive count charges Defendant with causing employees of Corsa to initiate the wire referenced in Count 2, transferring more than $385,000 to Ahmed, with the intent to promote the SUAs of violating the FCPA or Egyptian law prohibiting bribery of public officials.

*Statute*: 18 U.S.C. § 1956(a)(2)(A); 18 U.S.C. § 2

*Specified Unlawful Activity*:
1) Violation of the FCPA – 15 U.S.C § 78dd-2
2) Offense against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Egyptian law – 18 U.S.C. § 1956(c)(7)(B)(iv)

*Transaction*:
On or about April 20, 2017, Defendant caused employees of Corsa, located in the Western District of Pennsylvania, to initiate a wire transfer in the amount of $385,166.67 from Corsa's bank account in Ohio to Ahmed's bank account in the United Arab Emirates.

<u>Count 6: Substantive International Money Laundering</u>
This substantive count charges Defendant with causing employees of Corsa to initiate the wire referenced in Count 3, transferring $240,000 to Ahmed, with the intent to promote the SUAs of violating the FCPA or Egyptian law prohibiting bribery of public officials.

*Statute*: 18 U.S.C. § 1956(a)(2)(A); 18 U.S.C. § 2

*Specified Unlawful Activity*:
1) Violation of the FCPA – 15 U.S.C § 78dd-2

2) Offense against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Egyptian law
18 U.S.C. § 1956(c)(7)(B)(iv)

*Transaction*:

On or about August 31, 2017, Defendant caused employees of Corsa, located in the Western District of Pennsylvania, to initiate a wire transfer in the amount of $240,000 from Corsa's bank account in Ohio to Ahmed's bank account in the United Arab Emirates.

Count 7: Conspiracy to Commit Wire Fraud
This count addresses the agreement that existed between Defendant Hobson and Ahmed to funnel portions of the commissions paid from Corsa to Ahmed, back to Defendant Hobson himself, ultimately totaling approximately $200,000.[2]

*Statute*: 18 U.S.C. §§ 1343, 1349

The Indictment also contains accompanying forfeiture allegations for Counts One, Two, Three, and Seven. ECF No. 3 at ¶¶ 84-86.

**B. Procedural History**

Defendant Hobson was arraigned on the Indictment on April 19, 2022. ECF No. 18. Since his arraignment, and at Defendant's request, trial of this matter has been continued multiple times. The Court has deemed all passing time to be excludable delay pursuant to the terms of the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, until February 3, 2026. ECF Nos. 20, 29, 33, 35, 46, 48, 52, 55, 58, 60, 61 63, 74, 102, 109.

On February 3, 2026, the Court empaneled a jury in this matter, consisting of twelve deliberating jurors and four alternates. Opening statements are scheduled to begin on February 9, 2026.

---

[2]    The Indictment, ECF No. 3, lists acts in furtherance that total approximately $167,000. The Government's anticipated proof at trial, however, will ultimately identify approximately $200,000 that Defendant Hobson received in illegal kickbacks.

## II.    TRIAL LENGTH AND GOVERNMENT'S ANTICIPATED EVIDENCE

The Government currently estimates approximately six days for its case in chief, and the Government's evidence will include testimony of fact witnesses from Corsa—including co-conspirator Mr. Cushmore, who has pleaded guilty and is cooperating—as well as a range of documentary evidence that establishes the existence of the criminal scheme and demonstrates Defendant's participation therein. Defendant regularly coordinated with his co-conspirators by email and text message, yielding reams of evidence explicitly documenting his (i) discussion of the bribe payments, amounts, recipients, and expected contract awards in exchange for those bribes; (ii) approval of Corsa's commission payments to Ahmed to fund those bribes; and (iii) arrangement to take kickbacks from those same commission payments, and to receive those kickbacks from Ahmed in the form of cash or electronic transfer. As further described below, the Government will also call law enforcement witnesses from the Federal Bureau of Investigation ("FBI") to testify regarding this investigation and evidence they obtained and analyzed.

The Government will further offer testimony from two expert witnesses:[3] retired FBI Special Agent Stephen McFall and Cornell Law School Professor Mohamed Arafa. Mr. McFall conducted the forensic extraction and processing of Defendant's cell phone, which led to the discovery of the text (SMS and WhatsApp) messages described above, and other documents reflecting the coordination and execution of the bribery and kickback schemes. Professor Arafa's testimony will focus on Egyptian law, which will demonstrate that Al Nasr was, in fact, an Egyptian state-owned and state-controlled company, assisting the jury's determination that (i) the

---

[3]    As reflected in the Government's January 22, 2025 Expert Disclosure, the Government does not contend or concede that that any portion of Mr. McFall's testimony requires that he be formally qualified as an expert. However, the Government provided notice of his expert testimony out of an abundance of caution. Defendant has not challenged Mr. McFall's qualifications, nor has he identified a forensic expert of his own. In an effort to avoid further disputes, and to make the most efficient use of the Court and jury's time, the Government plans to call Mr. McFall and qualify him as an expert.

entity is an "instrumentality" and (ii) its employees were "foreign officials," as those terms are defined and used in the FCPA. *See* 15 U.S.C. 78dd-2(h)(2)(A). Professor Arafa will also testify regarding Egyptian criminal law, which forbids bribery of public officials like executives and employees of Al Nasr.

### A. Defendant's Bribery and Kickback Scheme

Corsa—which was based in Friedens, Pennsylvania, before declaring bankruptcy in January 2025—sold coal to customers domestically and abroad. Corsa typically relied on third-party sales agents to engage with foreign customers. In 2016, as Vice President of Sales and Marketing, Defendant Hobson had primary responsibility for Corsa's sales in Egypt, which focused on a single, Egyptian state-owned customer: Al Nasr. Defendant Hobson knew—and at times lamented along with Ahmed—that Al Nasr was owned and controlled by the Egyptian government, because the associated bureaucracy would cause delays and other business difficulties.

Defendant's engagement with Ahmed began in 2016, and Defendant Hobson led the Egypt sales effort from 2016 into 2018. During that time, Defendant worked with fellow Corsa Vice President Frederick Cushmore, Jr., who assisted with the business dealings and associated coal shipments to Egypt. And throughout that time, Defendant Hobson regularly and repeatedly communicated with Ahmed about the necessity of bribing Al Nasr executives to obtain the award of contracts for Corsa. To fund these bribes, Defendant caused Corsa to pay outsized "commissions" to Ahmed and his company, Intertech, for its services as Corsa's sales agent. Defendant discussed these arrangements via email and encrypted text message, including, among many other examples:

- Emailing Corsa colleagues in November 2016 (including Mr. Cushmore), explaining that Ahmed's request for exorbitant commissions related to "a few

that the agent has to take care of when cutting a deal" in Egypt, and justifying the extra payments because "Fred [Cushmore] sent out a spreadsheet showing the margin on this business at these price levels. Quite high."
GX 300.

- Emailing Corsa colleagues in December 2017, remarking that Ahmed "want[s] to be able to relay to his associates that they will be taken care of to finish securing the Term deal." The forwarded underlying email from Ahmed explicitly stated that, "after the Chairman and the Commercial Director," Ahmed needed to "'convince' the 9 high committee members as well."
GX 312 (quotation marks around "convince" in original).

- Discussing, in January 2017, specific amounts distributed to various officials with Ahmed Nassar, wherein Ahmed texted: "Here [*sic*] how it works: HH 50 M 50 G 50 Mr. C 100 AN 100 MEANS 450 (7.5)"[4] Defendant Hobson responded "Take HH out this time." In response, Ahmed writes "No you are IN."
GX 401.10.

Defendant regularly approved or caused the payment of Ahmed's (Intertech's) invoices, causing multiple international wire transfers from Corsa to Ahmed that funded the scheme. And Defendant also arranged for Ahmed to kick back a portion of Corsa's commission payments to Defendant Hobson himself. WhatsApp messages between Defendant Hobson and Ahmed reflect (i) the inclusion of Defendant Hobson on the "team" that received funds from Ahmed, and (ii) the means by which Ahmed transferred the kickback proceeds to Defendant Hobson through 2018.

In the first several months of 2018, Defendant Hobson departed Corsa and purchased an affiliated business in Tennessee—KopperGlo—which supplied Cosa with coal for further sale, including to Al Nasr. Mr. Cushmore then took over the leadership role for the Company's sales in Egypt, including continuing coordinating bribe payments with Ahmed.

---

[4]     Numerous messages between Defendant and Ahmed and make clear that "HH" refers to Hunter Hobson, "AN" refers to Ahmed Nassar, and the "M," "G," and "Mr. C" initials refer to officials at Al Nasr, including the Al Nasr Chairman.

However, even after leaving Corsa, Defendant Hobson did not withdraw from the conspiracy. Instead, he continued supporting the bribery scheme and coordinating with Ahmed to receive the kickbacks he was owed. Defendant Hobson continued communicating and coordinating with Mr. Cushmore to ensure the continued operation of the scheme. When Defendant left Corsa, he had not received all the kickback payments he was owed by Ahmed. Throughout 2018 and into 2019, Defendant Hobson continued exchanging text messages with Ahmed to coordinate the payment of the outstanding amounts, including traveling to Dubai to accept funds from Ahmed in cash, using a fabricated invoice to legitimize the deposit of $150,000 into Defendant's bank account in Dubai, and wiring the funds to Defendant's bank account in the U.S.

In 2020, Ahmed ceased communication with Defendant Hobson and Mr. Cushmore, and his sudden disappearance alarmed both men and others at Corsa. The Al Nasr Chairman, who had been one of the bribe recipients in Defendant's scheme, Mohammed Fawzy, had been removed from his role at Al Nasr, and concerns quickly arose that Ahmed and Fawzy had been arrested for their involvement in a bribery scheme.[5]  For a short time thereafter, Corsa directly engaged with Al Nasr officials directly, and the Company thereafter sold coal to Al Nasr without paying commissions to Ahmed, or bribes to Fawzy or other Egyptian government officials.

At the conclusion of the bribery scheme, (i) Corsa had obtained nearly $140 million in contracts for the sale of coal to Al Nasr, (ii) Ahmed had been paid approximately $4.8 million in

---

[5]      The Government provides this information only for the Court's background and contextual understanding as these events are what ultimately led to the discovery of the scheme and Corsa's self-disclosure to the Government. The Government does not intend to elicit trial testimony regarding suspicions that Ahmed or Chairman Fawzy's arrests and subsequent charges and convictions for their role in the instant scheme. Accordingly, and as described at the February 4, 2026 final pretrial conference, the Government intends to lead its witnesses through this portion of the direct examinations.

commissions from Corsa, and (iii) Defendant Hobson had personally received approximately $200,000 in kickbacks from those "commission" payments.

### B. Evidence at Trial

At trial, the Government expects to introduce evidence from a variety of sources to establish Defendant's leadership of, and participation in, the charged bribery, money laundering, and kickback schemes. A brief review of that evidence follows.

a. <u>Witness testimony</u>

*i. Percipient Fact Witness Testimony*

The Government intends to call fact witnesses who will explain Corsa's business operations and Defendant's role and responsibilities within the company. These witnesses, including former Corporate Controller and Director of Finance Daniel Bonacci, former Sales and Logistics Manager Linda Zellem, and former Accountant Michelle Dzierzynski, will testify regarding Corsa's sales worldwide and, specifically, in Egypt. They will detail how Corsa's sales to Egypt's state-owned Al Nasr—which were led by Defendant Hobson and, later, Mr. Cushmore—differed from Corsa's sales to other customers, particularly in the unusually high commission rates. And they will confirm that Defendant Hobson and, later, Mr. Cushmore, authorized and caused Corsa to pay millions of dollars in commission payments to Ahmed. These witnesses' testimony will be supported by a range of Corsa's business records and internal emails, which illustrate relevant sales activity and associated payments, along with Defendant's own communications authorizing and causing payments that facilitated the bribery, money laundering, and kickback schemes.

Significantly, Mr. Cushmore will also testify and provide the jury with an insider's perspective on the bribery scheme. The Government anticipates that Mr. Cushmore will testify to

his knowledge of, and participation in, Defendant Hobson's bribery scheme during the 2016-2018 period, when Defendant Hobson led those efforts and coordinated with Ahmed to bribe government officials at Al Nasr. Mr. Cushmore will further detail Defendant Hobson's lack of withdrawal from the conspiracy despite departing Corsa in 2018, and Defendant's ongoing support of the scheme—including Mr. Cushmore's continued engagement with Hobson regarding Corsa's sales to Al Nasr.

### ii. Law Enforcement Witness Testimony

In addition to percipient fact witnesses, the Government anticipates calling agents and a forensic analyst from the FBI, to explain the steps taken, evidence collected, and analysis conducted as part of the investigation. Special Agent Laura Timens served as the FBI lead case agent on this matter, and she obtained and examined relevant business records, emails and text and WhatsApp messages, and financial records in this case. FBI forensic analyst Scott Griggs analyzed voluminous financial transaction records in this case, and he will testify regarding relevant financial flows related to the charged schemes.

If appropriate, the Government may also call FBI Supervisory Special Agent Elizabeth Crispino, who conducted Defendant's proffer-protected interviews.

### b. Expert testimony

The Government intends to elicit testimony from two expert witnesses: retired FBI Special Agent and forensic expert Stephen McFall, and Cornell Law School Professor Mohamed Arafa.

### i. Retired FBI SA and Forensic Stephen McFall

Mr. McFall, now retired, was a Special Agent with the FBI for nearly 35 years, from 1988 to 2022. In his career, he processed and extracted hundreds of phones and other electronic devices. In this case, Mr. McFall conducted the forensic extraction of Defendant Hobson's cell phone in

May 2021. He will explain the forensic extraction and processing of such phone as well as how the data was staged for agent review.

Mr. McFall will assist the jury in understanding the process by which a forensic extraction and processing allows access to the documents that a phone contains, including, *inter alia*, WhatsApp messages, SMS text messages, emails, and their component parts and information fields as yielded by a forensic extraction. As to Defendant Hobson's phone specifically, Mr. McFall's testimony will also address the numerous messages and other documents on that device, which have already been authenticated by Mr. McFall's certification pursuant to Fed. R. Evid. 902(13) and 902(14).

### ii.  *Professor Mohamed Arafa*

Professor Mohamed Arafa is an Egyptian-trained legal scholar, who holds an S.J.D. from Indiana University, Robert H. McKinney School of Law, and currently teaches at Cornell Law School. As disclosed in his January 2025 expert declaration, Professor Arafa will testify regarding various aspects of Egyptian law that will assist the jury's determination that (i) Al Nasr, as an Egyptian state-owned entity, is an instrumentality of Egypt, and its employees are therefore "foreign officials" under the FCPA, and (ii) Defendant Hobson's money laundering charges rest on a valid predicate Specified Unlawful Activity—that is, Egypt's criminal law prohibiting the bribery of public officials.

The Government respectfully submits that both topics will be clearly established by Professor Arafa's testimony and explanation of relevant law. As reflected in decades of Egyptian legal texts, Al Nasr was designated a public company under Egyptian law and subject to the Public Sector Companies Law, No. 203. Moreover, Al Nasr was created by the Egyptian government; wholly owned by Egyptian government entities, funded by the Egyptian government (with profits,

if any, accruing to the Egyptian government); staffed with management appointed by the Egyptian government; controlled by the Egyptian government; and, in 2022, officially dissolved and liquidated by the Egyptian government. All of these indicia will support the jury's determination, in accordance with *United States v. Esquenazi*, that Al Nasr was an "instrumentality" of the government of Egypt. 752 F. 3d 912 (11th Cir. 2014). Similarly, the Egyptian Penal Code explicitly specifies that it is a crime to pay or offer to pay a bribe to public officials (which would include executives of Al Nasr), in exchange for performing or refraining from performing any of the duties of his or her job.

Although the jury should consider Professor Arafa's testimony to determine whether (i) Al Nasr was an Egyptian instrumentality as that term is used in the FCPA and, accordingly, (ii) its employees were "foreign officials" under the FCPA, the second topic of Professor Arafa's testimony is a purely legal matter. The Government respectfully submits that the evaluation of Egyptian bribery law as an "offense against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official," 18 U.S.C. § 1956(c)(7)(B)(iv), is a legal issue that is properly decided by the Court pursuant to Fed. R. Crim. P. 26.1. Accordingly, following Professor Arafa's testimony and before deliberations, the Government anticipates requesting that Court charge the jury that it has made this determination as a matter of law.

Defendant Hobson has not designated a defense expert on the above issues, nor has he challenged Professor Arafa's credentials or the relevance of his opinions.[6] As permitted by the

---

[6] At the February 4, 2026 final pretrial hearing, counsel for Defendant asserted, for the first time, that Al Nasr was, at some point in its history, a privately held company (and, thus, not a state-owned entity). Defendant appears to be mistaken on this point. To undersigned counsel's understanding, which is supported by nearly 70 years of Egyptian legal documents, Al Nasr was created by Egyptian law—specifically, by Presidential Decree in 1961. From that point forward, and at all times relevant in this case, its shares were owned by the Egyptian government, until it was dissolved by another act of the Egyptian

Court's Order following the final pretrial conference, Professor Arafa will testify with a demonstrative aid for the jury regarding certain provisions of Egyptian law. *See* ECF No. 164.

### c.  Emails and Text Messages

The Government's investigation yielded a trove of emails and text and WhatsApp messages documenting the charged conduct and, particularly, Defendant's participation in multiple criminal schemes to bribe Egyptian government officials and obtain kickbacks of funds that Corsa paid to Ahmed. As described below, *see infra* Section IV.A, nearly all of those documents have already been deemed self-authenticating, with the exception of two emails that will be authenticated by witness testimony. Also, as further explained below, nearly all of these documents are covered by the Federal Rule of Evidence 801's hearsay exclusions, and in the rare instances that these documents contain Rule 802 hearsay, multiple exceptions apply.

### d.  Corsa Business Documents

Corsa produced various business records in the course of the Government's investigation, and those documents have been determined authentic and admissible on the basis of an appropriate Rule 902(11) certification. ECF Nos. 157, 164. Such documents include, *inter alia*, contracts, amendments, letters of credit, and associated documents related to Corsa's sales of coal to Al Nasr; invoices that Ahmed submitted to obtain payments that funded the bribery and kickback schemes; Corsa's internal accounting and payment-tracking documents reflecting its processing of those payments; and other, similar, records.

---

government in 2022. Undersigned counsel is unaware of the basis for Defendant's representation during the final pretrial hearing, but it may stem from an erroneous reference in an email of a Corsa employee, which was subsequently corrected. To the extent that Defendant seeks to rely on what appears to be an error of a non-testifying witness, the Government will object at trial. The jury should not be subjected to inaccurate, misleading and confusing evidence on this point.

e.   Bank Records and Financial Transfer Documents

During its investigation of this matter, the Government collected financial records reflecting relevant money flows and financial transfers, which it will introduce in its case in chief. These documents mainly include records from Huntington Bank (showing payments from Corsa to Ahmed Nassar); New York Federal Reserve Bank (FedWire) (showing wire transfers from an entity owned by Defendant Hobson in the United Arab Emirates to an entity owned by Defendant Hobson in the United States); First Tennessee Bank (showing the location of transactions on Defendant Hobson's personal account on relevant dates); Pinnacle Bank (showing kickback payments flowing into a business entity owned by Defendant Hobson); and Western Union (kickback payments). They also include records obtained from the Financial Crimes Enforcement Network bureau of the United States Treasury Department, which show that Defendant Hobson reported traveling from Dubai into the United States with $34,000 in cash, and that he reported opening a bank account in the United Arab Emirates. The Court has determined that these records are self-authenticating pursuant to Rule 902(11). ECF No. 157.

## III.   DEFENDANT'S ANTICIPATED EVIDENCE

At the time of this filing, Defendant has identified two witnesses and one exhibit for use at trial.[7]

### A.  Defendant's Witness List

Defendant's witness list currently identifies two individuals, both of whom are current or former U.S. DOJ prosecutors: Criminal Division, Fraud Section, Trial Attorney Shy Jackson, and former U.S. Attorney for the Western District of Pennsylvania, Eric Olshan. To the Government's knowledge, Defendant has not subpoenaed either witness, nor has he submitted a *Touhy* request as

---

[7]    Defendant's exhibit list originally identified five exhibits. All but one were excluded by the Court's rulings on motions *in limine*.

required by governing law. *See* 28 C.F.R. §§ 16.21, *et seq*. Further, the anticipated testimony from both witnesses has been precluded by the Court's ruling on the Government's motion in *limine* to exclude inadmissible hearsay (ECF No. 122). The Government does not believe that either Mr. Olshan or Ms. Jackson may properly testify at trial in this matter. However, the Government will reserve its objections and file any accompanying motions to quash after Defendant actually subpoenas one or both of these witnesses, or otherwise attempts to call either of them to the stand.

### B.  Defendant's Exhibits

Defendant's exhibit list currently includes one document: Defense Exhibit B, a black-and-white photocopy of a translated "list of witness and evidences" and Arabic-language document, purportedly from a court in Egypt. The Government respectfully submits that DX B suffers from numerous deficiencies and evidentiary shortcomings. At the February 4, 2026, final pretrial conference, the Court held its admissibility ruling on DX B in abeyance, pending further submissions and discussions between counsel. ECF No. 164. The Government respectfully details its continuing objections below. *See infra* Section IV.B.

### IV.    OUTSTANDING EVIDENTIARY ISSUES

### A.  Admission of Emails and Text Messages in Government's Case in Chief

The Government's case in chief will establish that Defendant coordinated with co-conspirators, and executed much of his criminal scheme, over text message and email. During the investigation of this case, the Government collected those documents from various sources, mainly including (i) production of Corsa's emails and attachments in response to a grand jury subpoena, as well as a limited set of emails produced directly by Defendant and another Corsa employee; (ii) execution of a search warrant for Ahmed Nassar's Gmail account; (iii) a May 2021 forensic extraction of Defendant's phone, which he voluntarily provided to law enforcement, and (iv)

September 2020 forensic extractions of Mr. Cushmore's personal and work phones. In support of its submission that these trial exhibits are both authentic and admissible as evidence in the Government's case in chief, the Government addresses each category in turn:

a. Authenticity

At trial, the Government will submit various emails and text messages along with the necessary "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid 901(a). The Third Circuit and others have held that the threshold for establishing authenticity is "slight." *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013) (quoting *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985)); *see also Link v. Mercedes-Benz of North America, Inc.*, 788 F.2d 918, 927 (3d Cir. 1985). Conclusive proof of a document's authenticity is not required, rather, a mere *prima facie* showing of some competent evidence to support authentication is sufficient. *McQueeney*, 779 F.2d at 928; *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir.1976). "Once a *prima facie* case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Goichman*, 547 F.2d at 784.

Here, the relevant documents are electronic communications (emails and text (WhatsApp and SMS) messages) by and among Defendant, his co-conspirators, and other Corsa personnel. The Court has already determined that the bulk of these emails and text messages are self-authenticating, pursuant to certifications of qualified persons under Fed. R. Evid. 902(13) and 902(14). The Government will address each document set in turn:

        *i.  Corsa emails*
           *(GX 300-304, 306-313, 315, 316, 318-320, 322-324, 326-333, 335)*

Corsa produced these emails, through counsel, in response to a grand jury subpoena during the investigation of this matter. In responding to the subpoena, Corsa personnel accessed their email system, which resided on servers hosted by Expedient, a company that provides Information Technology ("IT") services, and printed/converted the emails and attachments to Portable Document Format ("PDF). These PDF files were then delivered to the Government and later produced in discovery in this case.

The above-referenced Corsa emails are self-authenticating, as the Government has procured Rule 902(13) certifications from both Corsa and Expedient personnel, demonstrating that the records were generated by an electronic process or system that produces an accurate result. GX 614, 615. At the February 4, 2026 final pretrial conference, the Court granted the Government's motion to authenticate these documents. ECF No. 164.

        *ii.  Emails obtained by search warrant*
           *(GX 305, 314, 317, 321, 321A-B, 325)*

In June 2022, the Government obtained a search warrant for the content of Ahmed Nassar's Gmail account, and the subsequently obtained documents further illustrate the criminal scheme charged here, as well as Defendant's participation in it. Google delivered an appropriate certification of authenticity for the search warrant returns, pursuant to Federal Rules of Evidence 902(11), 902(13), and 902(14). By Order dated January 28, 2025, the Court has determined these documents to be properly authenticated. ECF No. 157.

*iii. Emails produced by Defendant and other Corsa personnel (GX 300, 312)*

Defendant Hobson and another former executive of Corsa Coal, Chief Executive Officer George Dethlefsen, also produced documents in response to grand jury subpoenas during the investigation of this matter. Relevant here are two emails on the Government's exhibit list. On their faces, both emails include multiple indicia that would "support a finding," in accordance with Fed. R. Evid. 901(a), that they are emails from Hunter Hobson during his employment at Corsa. The emails (i) bear standard email header information, including names of senders and recipients and accompanying email addresses at the @corsacoal.com domain;[8] (ii) include date and time stamps (with data for the hour, minute, and second of transmission/receipt); (iii) include Defendant Hobson's signature block in one email, with his address and phone numbers; and (iv) include a sign-off used by Defendant Hobson in another email: "HH." Such evidence constitutes "distinctive characteristics and the like" sufficient to authenticate these documents, including, among other things, the emails' "appearance, contents, substance, internal patterns," and similar aspects, "taken together with all the circumstances," including "comparison with an authenticated specimen" such as the self-authenticating emails from document categories listed above. *See* Fed. R. Evid. 901(3), (4); *see also United States v. Safavian*, 435 F. Supp. 2d 36, 40 (D.D.C. 2006) (email authentication appropriate under Fed. R. Evid. 901(4), based on header information, to/from fields, email addresses, and sender signatures, and appropriate, and further supported by comparison with other already-authenticated emails under Fed. R. Evid. 901(3)).

Beyond the contents of the emails themselves, and their commonalities with other already-authenticated messages, live witness testimony will further support authentication of these

---

[8]    The email that Defendant Hobson produced, GX 300, has visible but obscured email addresses in the top-line message. However, the underlying email, which Defendant forwards in his top-line message, clearly indicates just one recipient: hhobson@corsacoal.com, which (i) is Defendant's email address as

documents. Both emails were sent to Mr. Cushmore, among other Corsa personnel, and his testimony about these messages will more than establish the "slight" finding required for authentication here. *See Turner*, 718 F.3d at 232.

### iv. Text messages
### (GX 400-410.1K)[9]

Text messages and documents from Defendant Hobson and Mr. Cushmore's phones have already been deemed self-authenticating. Messrs. McFall and Kulkarni both provided standard Rule 902(13) and 902(14) authenticity certifications, and the Court granted the Government's motion to authenticate the extracted documents on January 28, 2026. ECF No. 157.

### b. Admissibility

The communications referenced above—which occurred between and among Defendant and his co-conspirators—are primarily admissible on the bases of two hearsay exclusions: statement of an opposing party (Fed. R. Evid. 802(d)(2)), and statement of a co-conspirator during and in furtherance of the conspiracy. The Government addresses each exclusion in turn.

---

displayed in other self-authenticating messages that were produced by Corsa, *e.g.*, GX 307, and (ii) is consistent with the email convention used by other Corsa personnel in additional already-authenticated exhibits. As discussed elsewhere in this Memorandum, such similarities support an authenticity finding by "comparison with an authenticated specimen[.]" Fed. R. Evid. 901(b)(3).

[9]    In preparing for trial, counsel for the Government has endeavored to narrow its exhibits and streamline its presentation of messages. Accordingly, the Government's exhibit list presently includes the full extractions of chats and message-strings, as well as the excerpted message strings that it intends to introduce into evidence, which focus on specific, highly probative, conversations.

However, at the February 4, 2026 final pretrial conference, counsel for Defendant advised the court that the defense may cross-examine witnesses, including FBI Agent Laura Timens, regarding lack of context for various messages or inability to identify individuals who are referenced in the messages using initials or other shorthand abbreviations, among other things. In response to Defendant's assertion, the Government may expand its introduction of chat messages to include the dozens of additional messages that confirm the identities of participants in the conspiracy—including specific Egyptian government officials—and establish Defendant's participation in the charged criminal schemes and provide that context.

Defendant Hobson's own communications—whether by email, text message, or otherwise—are excluded from the definition of hearsay pursuant to Fed. R. Evid. 801(d)(2)(A). That Rule applies to Defendant's statements, including "oral assertion[s], written assertion[s], or nonverbal conduct, if [Defendant] intended it as an assertion." Fed. R. Evid. 801(a). Accordingly, any such assertions by Defendant Hobson "in an individual or representative capacity" may be offered against him. Fed. R. Evid. 802(d)(2)(A); *see also United States v. Browne*, 834 F.3d 403, 415-16 (3d Cir. 2016) (citing *United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000) (properly authenticated email admitted as statement of party opponent pursuant to Fed. R. Evid. 802(d)(2)(A)).

As for Government Exhibits containing communications sent by Fred Cushmore and/or Ahmed Nassar, such messages (whether email or text) are also excluded from the definition of hearsay, as they were "made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Admission of an out-of-court statement under this exclusion requires a showing that:

1) a conspiracy existed;
2) the declarant and the party against whom the statement is offered were members of the conspiracy;
3) the statement was made in the course of the conspiracy; and
4) the statement was made in furtherance of the conspiracy.

*Turner*, 718 F.3d at 231 (citing *United States v. Ellis*, 156 F.3d 493, 496 (3d Cir. 1998)). This *prima facie* showing requires proof only by a preponderance of the evidence, and importantly, to prove these elements, "the Government may rely on the co-conspirator's statements themselves, if they are corroborated by independent evidence." *Id*. (citing *Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *United States v. Gambino*, 926 F.2d 1355, 1361 (3d Cir. 1991). Further, co-conspirator statements are admissible under Rule 801(d)(2)(E) "even if the basis for admission is

a conspiracy different from the one charged." *Turner*, 718 F.3d at 231 (quoting *Ellis*, 156 F.3d at 497).

At trial, the Government will more than satisfy its preponderance-of-the-evidence burden on these elements. The statements themselves, including emails and message strings, (i) set forth the bribery, money laundering, and kickback schemes; (ii) identify the bribe recipients (by both initials and, on occasion, names and titles/positions); (iii) specify the amounts to be paid to various individuals; (iv) arrange for Corsa to pay commissions to Ahmed (thereby funding the bribes); and (v) coordinate transfers of portions of the commissions back to Defendant Hobson, either by electronic transfer or delivery of cash. And these co-conspirator statements, which the Court may properly consider in determining the existence of a conspiracy, *see Turner*, 718 F.3d at 231, are corroborated by a swath of other admissible evidence:

- Corsa business records documenting the Al Nasr contract awards that were the product of the bribery scheme;

- Ahmed Nassar's invoices to Corsa, prompting commission payments that funded the scheme;

- Corsa's transmission of commission payments (which Defendant Hobson authorized);

- Delivery of portions of Ahmed Nassar's commission payments back to Defendant Hobson, documented by, among other records, electronic transfers and emails sent by Defendant Hobson himself; and

- Defendant Hobson's own emails and text messages—independently admissible as statements of a party opponent—in which he coordinates the bribery and kickbacks with Ahmed Nassar and Fred Cushmore, and encourages the success of the scheme.

The Government submits that the above-listed documentary evidence, which comprise dozens of exhibits in this case, more than meets the Government's preponderance-of-the-evidence burden to

admit the statements of Defendant's co-conspirators.[10]  But even if such a showing did not suffice,

the Court will also hear the testimony of co-conspirator Mr. Cushmore detailing the conspiracy,[11]

its purpose, and its participants—including Defendant Hobson.

Finally, although the vast majority of Government exhibit-communications will be

admissible either as statements of a party opponent or statements of a co-conspirator, to the extent

that those hearsay exclusions do not apply to a particular document or document-portion, the

relevant communication will still be admissible on a variety of other bases. For example, to the

extent that Defendant Hobson forwarded and commented on Ahmed's email discussion of

commissions and key Al Nasr personnel who needed to be "convince[d]" to award a contract,

*e.g.*, GX 312, Defendant Hobson's top-line forwarded email is admissible as an opposing party's

statement under Rule 801(d)(2)(A), and the underlying email from Ahmed to Defendant is

admissible as a Rule 801(d)(2)(E) statement of a co-conspirator in furtherance of the conspiracy.

But even if that exception did not apply, and the underlying email was not admitted as a co-

---

[10]     For the avoidance of doubt, Fed. R. Evid. 801(d)(2)(E) does not implicate the Confrontation Clause: "The Confrontation Clause does not bear on non-testimonial statements…it is well-settled that co-conspirator statements are non-testimonial." *United States v. Gurrola*, 898 F.3d 524, 535 (5th Cir. 2018); *United States v. Ayelotan*, 917 F.3d 394, 403 (5th Cir. 2019) (co-conspirator statements made during the course and in furtherance of a conspiracy to commit mail fraud were not testimonial, and admission of the statements did not violate the Confrontation Clause); *see also United States v. Mack*, 629 Fed. App'x. 443 (3d Cir. 2015); *United States v. Figueroa*, 729 F.3d 267 (3d Cir 2013); *United States v. Edwards*, No. 17-0003-04, 2018 U.S. Dist. LEXIS 124983, at *1-4 (W.D. La. July 25, 2018) (holding that a certification relating to digital telecommunications evidence pursuant to FRE 902(11), 902(13)and 902(14) rendered the evidence self-authenticating and did not violate the defendant's rights under the Confrontation Clause because it was not testimonial).

[11]     For the avoidance of doubt, and as further above, *supra* Section II.A, the Government further anticipates that Mr. Cushmore's testimony will establish Defendant Hobson's lack of withdrawal from the conspiracy even after his departure from Corsa in 2018. Defendant Hobson bears the burden of establishing withdrawal from any conspiracy, which requires him to "present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." *United States v. Jannotti*, 729 F.2d 213, 221(3d Cir. 1984). To the contrary, Defendant Hobson continued to support the conspiracy after he transitioned to ownership of KopperGlo, and he continued to request and accept kickbacks from Ahmed.

conspirator statement, it would nevertheless be properly received into evidence under Rule 801(d)(2)(B)'s exclusion for adoptive admissions, or for a non-hearsay purpose such as to show the effect on the listener (*i.e.*, Hobson, who then commented on it), evidence of Defendant's motive or lack of mistake in multiple aspects of the criminal conduct alleged here, evidence of verbal acts, and/or the rule of completeness. A similar analysis applies to all of the communications that the Government has included in its trial exhibits.

### B.  Defendant's Exhibit B – "List of Witnesses and Evidences"

Defendant has included, as proposed Defense Exhibit B, a purportedly Egyptian document that was produced by counsel for Ahmed Nasser, with a translation titled "List of Witnesses and Evidences," and which appears to include an Arabic and English statement of facts pertaining to Ahmed Nassar, including a confession that Ahmed paid bribes, such as cash and gifts to the Chairman of Al Nasr[12], on behalf of Corsa Coal in 2018 and later. At the February 4, 2026 final pretrial conference, Defendant Hobson maintained that he seeks to admit this document into evidence, and that it would qualify for a "hearsay exception,' though counsel cited no specific provision of the Federal Rules.

This document should be precluded from evidence based on the same reasoning that led the Court to exclude Ahmed Nasser's similar hearsay statements to his own counsel. *See* Gov't Mot. ECF No. 122, Reply ECF No. 153, Order, ECF No. 157. The Government will not repeat all of those arguments here, but in short, there is significant reason to doubt the relevance, reliability and accuracy of Ahmed's purported statements as to his corrupt conduct, regardless of whether Ahmed made those statements to his attorneys, or in some other forum like the "List of witnesses and evidences" in DX B.

---

[12]    Other documents transmitted by counsel specifically identify the individual who received the bribes from Ahmed, described in DX B as "the first accused," as Mohamed Fawzy.

Independently, the Government has objected to DX B on the bases of lack of authentication, relevance, and hearsay. Defendant cannot authenticate DX B with a witness—let alone whatever purported translations appear to accompany the document. And even if Defendant could make the meager showing required for authentication, he cannot establish the relevance of the statements or identify a hearsay exception that would allow their admission at trial. As to relevance, even ignoring the self-serving nature of the statements themselves (that is, avoiding additional criminal liability in the United States), they do not bear on whether Defendant Hobson authorized bribes in the 2016-2018 time period—or at any time, for that matter. Nor is any hearsay exception applicable here, and Defendant identifies none. Accordingly, and even assuming that they are legally relevant, the assertions set forth in DX B would only be admissible if they were presented by live testimony that is subject to cross examination at trial. Defendant has not sought Ahmed's testimony here, and understandably so, as cross-examination would be potentially catastrophic to Defendant's position. *See* ECF No. 122, at pp. 5–7. Put simply, and for a number of independent reasons, DX B is inadmissible.

Finally, as the Government highlighted during the February 4, 20226 final pretrial hearing, even if DX B were admitted, the defense would trigger the waiver provision of Defendant Hobson's proffer letter, and his otherwise proffer-protected inculpatory statements would be admissible for the jury's consideration. As further discussed below, *see infra* Part IV.C, Defendant has already acknowledged his role in coordinating with Ahmed to pay Al Nasr executives in return for the award of contracts to Corsa—including in the time period before 2018. The Government acknowledges that, because it is Defendant Hobson's decision whether to assert evidence or argument that may open the door to admission of his proffer-protected statements, the risk of waiver is not a basis to exclude DX B from evidence at trial. However, undersigned counsel raised

this issue at the final pretrial hearing, and includes it here, to avoid any doubt as to the consequences of Defendant's effort to use this document at trial.

### C. Defendant's Inculpatory Admissions and Waiver of Proffer Protections (*for Rebuttal Purposes Only*)

Before he was indicted in this case, Defendant proffered with the Government in May and June 2021. Defendant was represented by his current trial counsel on both occasions, and each interview was conducted in accordance with the terms of the Fraud Section's standard proffer letter. *See* Ex. A (Proffer Letter). That letter, in relevant part, (i) specified that "**THIS IS NOT A COOPERATION AGREEMENT**," (ii) obligated Defendant to respond to questions "truthfully and completely," and (iii) set forth the terms under which Defendant's statements could be used against him in the event that he was prosecuted:

> **In any proceeding**, including sentencing, **the government may use Client's statements and any information provided by Client** during or in connection with the meeting to cross-examine Client, **to rebut any evidence or arguments offered on Client's behalf**, or to address any issues or questions raised by a court on its own initiative.

*Id.* at 1, 2 (emphasis added). Defendant and his counsel signed the proffer letter and "acknowledge[d] that they have read, fully discussed, and understand every paragraph and clause in this document and the consequences thereof." *Id.* at 3-4.

During his proffer-protected interviews, Defendant made significant and inculpatory admissions regarding his participation in the bribery and kickback schemes with which he is now charged. Government's trial Exhibits GX 800.2 and 800.3 include FBI 302 reports of those interviews, which reflect the following:

- The commissions that Corsa paid to Ahmed Nassar "were so much higher [than in other countries] because Nassar had a team of individuals that needed to be 'taken care of' in order to ensure the shipments ran smoothly and, in an effort, to gain as much business as possible." *Id.* at 8.

- Ahmed "Nasser [*sic*] had a group of people who were 'part of the team', and he regularly talked about the team with [Defendant] Hobson[.]"   *Id.* at 5.

- "The Chairman and Commercial Director were part of Nasser's [*sic*] team," and "[t]hese individuals were always Generals or military individuals." *Id.*[13]

- Reviewing what has now been marked GX 401.10, Hobson identified the Al Nasr officials referred to Ahmed using initials: "'Mr. C' was the Chairman who received $100,000, and Nasser received $100,000. The other two individuals were the Commercial Director and the Quality Manager. Fawzy's first name was Mohammed, so that was probably the 'M'. Hobson did not recall the Quality Manager's name, but he was 'G'." *Id*. at 19.

- Hobson was "part of the team." *Id.* at 10. "Initially, Hobson said no to being on the team...[but] Hobson had relented to being on the team by the time the first vessel was ready to go. If Hobson was going to be involved, he wanted as much commission as possible." *Id.* at 12.

- Mohammed Fawzy was the Commercial Director at Al Nasr, and Hobson met with him in Egypt during the pendency of the now-charged scheme. *Id.* at 6.

- Defendant continued to participate in the scheme after the end of his employment with Corsa, as "[a]fter Hobson left Corsa, Cushmore and Hobson had phone calls about Nasser [*sic*] and dealing with the team." *Id.* at 8.

- Defendant implicated others at Corsa, indicating that Corsa's then-CEO also "knew the Chairman and Commercial Director were part of Nasser's [*sic*] team," and that Defendant had discussed "the commissions and the team" with the then-CEO "as far back as 2016 when Hobson was in Cairo." *Id.*

- "The team changed from time to time, but it was always the Chairman and Commercial Director. The other members of the team depended on other factors, such as whether or not the lab needed to be paid off." *Id.* at 9. Further, "[t]he amount of commissions also changed based on who needed to be paid." *Id.* at 10.

- Among Defendant and his co-conspirators, "[t]he word 'bribe' was never used, rather it was referred to as 'the den of thieves' or 'the circus' in the industry." *Id.* at 9.

- "Hobson thought he should have made approximately $200,000 but received about $150,000." *Id*. at 10.

---

[13]     Throughout the interview, Defendant also confirmed that Al Nasr was an Egyptian state-owned entity. *See, e.g.*, *id.* at 4 ("Al-Nasr was a state-owned Egyptian steel mill."); *see also id.* at 5 (observing that Al Nasr issued public tenders because it was a state-owned entity).

- "Every Western Union transaction was for a commission payment. Hobson never used Western Union for anything other than the commission payments." *Id*. at 20.

- In 2020, when Ahmed went missing, "Hobson was immediately concerned about his receipt of commissions." *Id.* at 31.

Defendant Hobson also acknowledged his own kickbacks, receiving them because he was "part of the team"—again underscoring he, like the Al Nasr "team" members, received illicit payments—but Defendant noted that he "was supposed to make more" from Ahmed Nassar than he actually received. *Id.* at 10.

The Government does not intend to introduce Defendant's proffer-protected admissions in its case in chief, but if Defendant testifies, or if the defense offers "evidence or argument" on his behalf that would be rebutted by Defendant's statements, then these statements are properly admissible. In *United States v. Hardwick*, the Third Circuit addressed precisely this "evidence or argument" language in a defendant's proffer letter, and held that introduction of proffer-protected statements was appropriate after the defense attempted to elicit evidence contradicting the defendant's admissions through cross-examination. 544 F.3d 565, 571 ("waiver of proffer letter protections triggered where "testimony elicited from [] witnesses on cross-examination was aimed at inferring that [codefendants 1 and 2], rather than [defendant], were responsible for the murders of [victims 1 and 2], contrary to the statements [defendant] made under the proffer agreement."). In short, and among other possible contradictions of his statements, if Defendant Hobson's counsel attempts to "shift the blame" for the bribery scheme to others, either through argument or questioning of witnesses, it will "trigger[] the terms of the waiver" in the proffer letter. *Id.* at 5470; *see also United States v. Frazier*, 469 F. 3d 85, 89 (3d Cir. 2006) (attorney cross-examination may constitute argument).

The Third Circuit, and courts around the country, have determined that waiver provisions of proffer agreements like the one here are "expansive." *Hardwick*, 544 F.3d at 570 (quoting *United States v. Barrow*, 400 F.3d 109, 118 (2d Cir. 2005)); *see also United States v. Rebbe*, 314 F.3d 402, 407 (9th Cir. 2002) (introduction of proffer-protected statements appropriate where defendant's "attorney presented evidence and made representations at trial that were inconsistent with his proffer statements."). "Evidence is evidence, whether it comes out on direct or cross-examination." *United States v. Krilich*, 159 F.3d 1020, 1025 (7th Cir. 1998). Moreover, "factual assertions made by a defendant's counsel in an opening argument or on cross-examination plainly fall within this broad language." *See Barrow*, 400 F.3d at 118.

Here, Defendant Hobson may still test the Government's evidence at trial, but if he wishes to avoid the introduction of his proffer-protected statements, he must vigilantly avoid opening the door to their use. Consistent with the terms of his proffer letter, Defendant Hobson has numerous avenues available to him, as he may:

> "challenge the sufficiency of the Government's evidence; call into question the credibility of Government witnesses; question Government witnesses about their knowledge and qualifications; challenge inconsistencies in the Government's evidence; and ask Government witnesses about their motives for testifying against [him.]"

*Rebbe*, 314 F.3d at 408 (citing *Krilich*, 159 F.3d at 1025). However, if, for example, the defense asserts—in opening statements, questioning of witnesses, or elsewhere—that Defendant Hobson did not know or was not involved in the payment of money through Ahmed Nassar to government officials at Al Nasr, then he will trigger the waiver provision of the proffer letter, and Defendant's contradictory statements will become admissible to rebut those assertions. Similarly, if the defense asserts, through evidence or argument, that Defendant Hobson did not coordinate with Ahmed

Nassar to take a portion of Corsa's commission payments for himself, then the proffer letter will authorize the introduction of Defendant's admissions to the contrary.

If Defendant Hobson or his counsel open the door to such usage, the Government will raise the issue with the Court before introducing any proffer-protected statements.

## V.    OUTSTANDING MOTIONS

At the time of this filing, there are no outstanding motions.

## VI.    STREAMLINING EVIDENCE AT TRIAL

To assist with the testimony of FBI Forensic Accountant Scott Griggs, the Government will present summary exhibits that he prepared, which synthesize voluminous financial data and authenticated Corsa business records. Those exhibits, GX 001 through GX 004, summarize payments made by Al Nasr to Corsa; payments made by Corsa to Ahmed and Intertech; and payments made by Ahmed to Defendant.

Exhibits GX 001 through GX 004 are admissible pursuant to Federal Rule of Evidence 1006(a), which permits admission of summaries and charts "offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Mr. Griggs reviewed and analyzed extensive materials—including bank records for several different accounts, wire transfer records, Western Union records, and lengthy invoice packets—in order to prepare these exhibits. The source materials for these exhibits are voluminous and complex and will be difficult for the jury to conveniently examine and easily synthesize at trial. Copies of the summary exhibits were produced to defense counsel on December 19, 2026.

The Government also intends to use an illustrative aid pursuant to Federal Rule of Evidence 107, which will not be offered into evidence. During Egyptian legal expert Professor Arafa's

testimony, he will reference PowerPoint presentation that contains the excerpts from the translations of Egyptian legal texts, including laws and Presidential decrees. Defendant agreed to this approach during the Pretrial Conference and the Court granted Government's request to use the demonstrative during Professor Arafa's testimony. *See* ECF No. 164.

Respectfully submitted,

TROY RIVETTI
UNITED STATES ATTORNEY (INTERIM)

*s/ Nicole A. Stockey*
Nicole A. Stockey
Assistant United States Attorney
PA ID No. 306955

LORINDA LARYEA
CHIEF, CRIMINAL DIVISION
FRAUD SECTION

*s/ Natalie R. Kanerva*
Natalie R. Kanerva
NY ID No. 5134952
Ligia Markman
DC ID No. 997430
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20005